## Conley v. Louisa Nat. Bank; Snyder et al. v. Same.

Nov. 12, 1943.

Woods, Stewart & Nickell and LeWright Browning for appellants.

S. S. Willis for appellee.

OPINION OF THE COURT BY JUDGE SIMS—Affirming.

These two actions were consolidated and heard together in the circuit court. Appellants, plaintiffs below, sued the Louisa National Bank to recover the

amounts of two time deposit certificates issued by the bank. The proof was taken by depositions and upon a final hearing the chancellor dismissed the petitions and this appeal followed.

A proper consideration of the cases necessitates rather a full statement of facts. Augustus Snyder was president of the bank and M. F. Conley was its cashier. These two men married sisters of G. R. Burgess, the bank's assistant cashier. The three had been thus connected with the bank for a long number of years.

On Feb. 26, 1927, Burgess received a time deposit of $5,000 from Mrs. Willie J. Burgess and issued to her a negotiable certificate therefor bearing 3% interest. On March 18, 1930, he received a time deposit of $1,500 from W. R. Riffe to whom he issued a certificate similar to the one issued to Mrs. Burgess. Each certificate was signed by Burgess as cashier instead of assitant cashier, but that fact is not material. Burgess took these two certificates from the back of the book as they were not numbered as were those in the front of the book; these being put in the back to replace certificates duly numbered which might be marred in being issued, as a number could be written in the certificates appearing in the back of the book. The deposits for which the certificates were issued to Mrs. Burgess and to Riffe were never entered on the books of the bank, nor were the certificates, and Burgess embezzled the $6,500.

A bank examiner discovered other defalcations of Burgess and in June 1930 he was removed as an officer of the bank. Soon thereafter he pleaded guilty and was sentenced to a term of five years in a federal prison. However, his embezzlement of the $6,500 received on these two deposit certificates was not discovered until some years later and he appears not to have been prosecuted for that, nor was it included in the settlement the bank made with the surety on his fidelity bond.

On May 12, 1931, Riffe presented his $1,500 deposit certificate to the bank and demanded cash thereon. Conley waited on him and at once knew the bank had not received the $1,500 called for in the certificate because it contained no number and the bank had no record of it. He realized his brother-in-law, Burgess, had embezzled the amount of the certificate. Burgess' peculations had shaken the public's confidence in the bank and Conley testified he knew the certificate would have to

be paid but he did not want it known that more of Burgess' misappropriations were being uncovered. He testified that he gave Riffe a receipt for his certificate and without making his actions known to anyone, deposited $1,500 of his own money in the bank to meet a check in this sum drawn by Riffe on May 23, 1931. But Conley could not say where he had obtained this $1,500 and he personally retained the certificate which bore Riffe's endorsement.

In the summer of 1932, Mrs. Burgess, through her son-in-law, K. C. Elswick, an attorney, demanded cash from the bank on her $5,000 certificate. Conley handled this transaction and as soon as he saw the certificate noticed it contained no number and realized that Burgess had embezzled the amount of it. He testified that he put Elswick off as long as he could and conferred with Snyder, the bank's president, and they decided to keep the matter from the board of directors and handle it personally. Questioning Elswick as to what use his mother-in-law would make of the money, Conley found she wanted to put it into bonds. At Conley's suggestion, Elswick agreed to let the bank buy the bonds for her and Elsewick was informed it would take a week or ten days to get delivery on them. Finally, Elswick became impatient and demanded the money or the bonds and Conley then informed him the bonds had arrived in that morning's mail and delivered to Elswick approximately $5,000 of bonds of the Louisa & Fort Gay Bridge Company.

Conley testified that the bridge bonds had been bought for Mrs. Burgess by the bank through its representative, The First-Third National Bank of Cincinnati. As a matter of fact, the bonds turned over to Mrs. Burgess had been purchased by the bank from Stranhan-Harris Company on Dec. 31, 1930, and had gone into the bank's bond account on Jan. 3, 1931, which was about a year and a half prior to Elswick's demand. The only excuse Conley had for this misstatement of a material fact in his testimony was that he had been mistaken as to the time of the purchase and the firm from whom it was made.

Snyder was president of the bridge company, as well as the bank, and the company carried a checking account in the bank. A check was given on the bridge company's account for $2,360. Conley refused to say

who signed the check but admitted that he paid it as cashier and said he and Snyder repaid it and the bridge company lost nothing. It might be well to state here that Conley was convicted for his irregularities connected with· the bank and served a term in a federal penitentiary, although just what he was convicted of is not shown in the record.

Snyder testified that he co-operated with Conley in paying this $5,000 certificate. That he raised $2,500 through some Childers notes which he obtained by executing a title bond on his farm. However, the record shows that Snyder told A. B. Farris, a national bank examiner, that he had no connection with the Childers notes and that they belonged to his wife. Snyder owed the bank $11,621.58 and he still owes it $3,398.84. His testimony is not clear or emphatic and is punctuated with many such expressions as "I suppose," "I don't remember," "That is my understanding," "I would think," and "That is my best judgment." It was agreed between Snyder and Conley that neither would mention even to their board of directors that they had personally taken up this $5,000 certificate.

After the delivery of the bonds to Elswick for his mother-in-law, Mrs. Burgess, Conley took the $5,000 certificate which had been endorsed by her. He secretly retained it and the $1,500 certificate until Feb. 28, 1936, when they were put in the hands of an attorney for collection. It is significant that during all the years these certificates were so secretly held, Conley was indebted to the bank in a large amount, as was Snyder, who claimed a half interest in the $5,000 certificate.

Conley was also indebted to the estate of his brother which he and his sister-in-law, Mrs. Anna Conley, were administering. So on June 23, 1936, by a separate instrument he assigned his interest in the two certifiicates to her although she never saw either certificate. She and Conley owed the bank $1,265 represented by three notes which she paid to the bank on Sept. 14, 1936. In a conference concerning the collection of the notes between her and Mr. Hughes, the then cashier of the bank, attended by their respective attorneys, she made no mention of the deposit certificates and did not ask that they be set-off against her notes. Nor did Snyder or Conley attempt to off-set the· certificates against sums they owed the bank.

No unbiased person reading this record can reach the conclusion that Conley satisfied the $1,500 certifiicate with his individual funds, or that he and Snyder furnished the money to purchase the bonds with which the $5,000 certificate was satisfied. Both were greatly indebted to the bank and in need of money, yet they say they did not even acquaint the board of directors of the bank with what they had done. As pressed for funds as they were, they asked the bank no interest on this $6,500 during the four years they held the certificates. Conley could not tell where he got the money to pay the $1,500 certificate but it may be inferred from this record that he obtained it from $33,000 in loose assets the bank held belonging to the Big Sandy Commercial Bank which was being liquidated, since Hughes testified it was later discovered Conley had used some of those notes. It is beyond doubt that the bonds with which the $5,000 certificate was redeemed belonged to the bank. The fact that the bank's bonds were used to satisfy this $5,000 certificate is not altered by the subsequent acts of Snyder and Conley in caring for the $2,360 check wrongfully drawn on the account of the bridge company and the $2,500 Childers notes placed in the bank so a depreciation of its assets would not appear. There is but little doubt that such action by Snyder and Conley was to prevent the additional defalcations of their brother-in-law from showing up, which they feared would be followed by additional prosecutions.

It must be remembered that these actions were brought on the certificates of deposit of which appellees claim to be the owners by assignment. We are firm in our conviction that the money and the bonds of the bank were used to satisfy these two certificates, therefore the debts evidenced by them were wiped out. KRS 356.119. Conley fraudulently obtained possession of the certificates instead of performing his duty as cashier and filing them with the bank's records. By so doing and subsequently assigning the certificates to his sister-in-law after the maker had satisfied them in full, he did not breathe new life into these two pieces of paper. An obligation once extinguished cannot be revived by endorsement or assignment to another. 10 C. J. S., Bills and Notes, sec. 451, p. 990. Logan County Bank v. Barclay, 104 Ky. 97, 46 S. W. 675.

Appellants cite many authorities to the effect that

these certificates were obligations upon the bank although their proceeds were embezzled by its assistant cashier, and the fact that appellants obtained the certificates after maturity gave the bank no defense against them it did not have against the payees of the certificates. We are in full accord with such principles but they have no application here because the proof shows the certificates were satisfied by the bank and not by Snyder and Conley. Having once been satisfied, the certificates were not resusciated by the payee's endorsement to Conley and his assignment of them to his sister-in-law.

The judgments are affirmed.